This is the Department of Agriculture Nobody come forward. Mr.Jackson. Please proceed. May it please the court. My name is Norman Jackson. I represent Patrick Carey. Mr.Jackson, which specific Douglas factor do you believe the USDA did not adequately consider and where do you raise that in your blue brief? They failed to follow regulations. I don't think I did raise that, Your Honor. Okay. Is there anything else? Yes, there is. Anything else as far as Douglas factors? I don't think so. I think I just raised the fact that they didn't comply with all of the Douglas factors, but I don't think I went beyond that. This case involves a 20-year Navy veteran, a Chief Petty Officer, devoted his life to serving his country. And when he retired from the Navy, he obtained a job with the, I guess, originally with the Department of Defense and then for the last five years of his career with the Department of Agriculture. He received a telephone call from his supervisor at one point telling him that people have told her that he was not at work when he was supposed to be. He got extraordinarily upset at that and claimed that... And he gets overwhelmed by that and claims, are you saying I cheated the government? And who said this anyway? And have you checked the video entrance to the building? Have you checked with the bus driver? She said she didn't believe it. Pardon me? His supervisor told him she didn't believe that he had been absent. Well, I guess one could say then why mention the subject at all? Because she was trying to counsel him, perhaps? It's conceivable. But when you get right down to it, he insists that this is not true, that there's no chance this is true, and asks her if she'd checked these things, and when she says no, she violates the agency regulation. She told him she didn't believe it. Why does she have to check it if she doesn't believe it? I didn't pick that up from the way the conversation went. It sure seems to be in the record. I just want to listen to the tape. There is a tape recording, and I would suggest to the court it's in the agency file. Well, we have the entire transcript on pages 130. I'm looking at it right now through about 140 of the appendix. So, no, I personally have not listened to the tape, but I didn't understand there to be any dispute over the characterization that, for example, Mr. Carey was very agitated, but that Ms. Stauer was calm, and I didn't understand you to be disputing the characterization. So, to my knowledge, we don't have the tape or provide it with the tape, but we have a transcript of it. That's good. That's good. The reaction by Mr. Carey was one of being overwhelmed, and once he— We can't second-guess an agency's penalty decision. All we can do is assess did they comply with the Douglas factors and then review it under a very deferential standard. So you can't stand here and try to just re-argue the same case to us because we're not a court of first impression who reconsiders the penalty de novo. So what is it about this case that you think amounted to an abuse of discretion by the agency? Because that's what you have to prove in order to prevail in this case. The abuse of discretion by the agency comes where Mr. Carey tape-records the telephone conversation and basically gets fired for it. Well, he didn't just get fired for tape-recording it. He also got fired, as I understand, the counts of his removal for distributing it as well and for the comments he made in conjunction with the distribution, which were a very derogatory attack on management. And then it's also my understanding that part of the reason he was fired is because he demonstrated no remorse for having done this and insisted he would never work with this supervisor again. So my understanding that the determination to fire him as articulated by the lower tribunal in this case was not limited to the fact that he recorded it. It was not limited to the fact that he sent it out. It also included the comments he made and his subsequent absolute refusal to ever be willing to work with the supervisor again. Am I misunderstanding what was, I think, the things that were considered and discussed expressly in the opinion below? No, I don't think you're misrepresenting that at all, Judge. I think that what has to be looked at is the fact that Mr. Carey spent his lifetime serving the United States government and was so overwhelmed by what happened that he doused himself with gasoline and attempted suicide. That was avoided by somebody stopping him, but he had what was described as post-traumatic stress disorder. He had a nervous breakdown. His wife was required to answer any questions that came from the agency. His wife had a nervous condition, and in one year, seven times, she was taken by ambulance to the hospital, and on the seventh time, she died. You need to look at what the effect of the conversation was on Mr. Carey, and going one step further— Can I just ask you, didn't all of the events you just described, every single one of them occur after the conduct that he committed in this case for which he was charged? That's true. So none of them are a mitigating explanation for what he was actually going through at the time he made this mistake in his employment. Well, yeah, those things happened after. They were the result. I mean, don't you agree with me that certainly if he was in the midst of dealing with his wife's trauma while he did this stupid thing, the agency would treat that differently. I do agree with you on that. But here, all of those things are consequences that he experienced in his life following this action, and therefore, they can't be used to necessarily go back in time and say, ah, well, boy, this guy was under a lot of stress at the time he did this, and it thus mitigated his behavior. That's true. We'd go more to damages if we ever reached that point. Let me continue, however. The regulations regarding tape recording. There isn't a slightest shred of evidence in the file that he was ever told or shown anything regarding tape recording. Most states in the United States allow one party to tape record a conversation, but the agency had a regulation specifically prohibiting it. However, the judge at page 18 of her opinion points out that the supervisor is supposed to give the copy or advise the person at some point in time before such a thing happens that it is prohibited by the Department of Agriculture's regulations. And there isn't the slightest shred of evidence in the file or that was ever presented that his supervisor gave him, told him, or did anything regarding not recording a conversation. And in fact, there isn't even an allegation without evidence that he ever was given the notice that he couldn't tape record. Was there evidence, for example, I know that he claimed he was not aware of it, but was there any evidence that he didn't receive it? Did he produce evidence that he didn't receive it? Did he question his supervisor? Did he produce evidence that other people possibly didn't receive it or were unaware of it or anything like that? No. Because he's an HR supervisor. Yes. And this is a policy of the agency that he is a supervisor for human resources in. I guess I'm questioning whether it isn't fair to impute to him the obligation of knowing the agency policies, given that he is an HR supervisor and he should be the person actually probably making sure everybody knows about the policies. Here is an individual who in nearly 30 years of his life had a spotless record. If he had the slightest indication that there was anything wrong with recording it, I believe that it is clear from his whole lifetime he would not have done something that he knew was a violation of law. First off, it's not a violation of law, as you've pointed out. It's a violation of agency policy. So those are two different things. But I'm not certain I agree with that, given what you've articulated in his mental state at the time and the fact that he didn't just record it. He sent it. And you read the email. He went on and on in the email about how people should send it to OPM, and this is a horrible example of leadership. And then later he said, I will never work with that woman again. And he showed no remorse for any of the actions. So here you're saying, you're telling me today he wouldn't have done this if he knew it was wrong, but isn't that consistent with his own refusal to express remorse for having done any of this? At least that's what the record shows. Again, I'm not judging his credibility. I've never met the person. He didn't testify in front of me. That's why an appellate court is really limited in terms of the level of review we can give, because I just want to be clear, I'm making no personal assessment of Mr. Kerry or his credibility or anything else. We don't get to do that on appeal. We don't have the ability to do that on appeal. Well, taking what he says is true, he still has tremendous problems, because he admits he sent out that copy of the electronic copy of the tape to everyone. I agree with that, Your Honor. I represented many clients in my years, and I worry about this one. I feel that he did what he thought was right. He may have been quite wrong and confused in what he did. His later actions, particularly the attempted suicide, scared me at the time, and I worry about the man. He devoted his life to his country, and this is the way he ends. It just doesn't seem to be the right outcome. So this has nothing to do with the case, but I'm going to pray for him tonight. Pardon me? This has nothing to do with the case, but I'm going to pray for him tonight. Me too. You're into your rebuttal time. Why don't we hear from the government? May it please the Court. Mr. Kerry was a human resources supervisor, and he had the obligation and responsibilities to provide guidance to nearly 2,000 federal employees, including disciplinary measures. Even before this Court, he shows no contrition, no signs of remorse. He continues to argue that his actions were reasonable. The agency was well within its discretion to terminate Mr. Kerry, and unless the Court has any questions, the government respectfully requests that the— Was his 20 years of spotless service taken into account in the assessment of his penalty? It was, Your Honor. It was considered as one of the Douglas factors. It may have disturbed his country. What about his mental health? I'm not going to go into detail about it in open court, but there's evidence that he does have some mental health concerns. How was that, if at all, factored into the assessment of his penalty? Your Honor, first, with respect to the mental health, as counsel acknowledges here and makes a point in his brief, the mental health was a result. It's not a cause of behavior, and they continue to argue that his actions were reasonable. Might it have been different if it were a cause of the behavior? Maybe then it could have mitigated. If it was argued to have been a cause of the behavior, then it probably should have been considered in the context of the punishment, right? Your Honor, the government, the agency did consider it in the mitigating circumstances. Yes, in the instance where it would have been a cause and not an effect, yes, the government would have considered that in analyzing that particular Douglas factor. But that is still just one of 12 Douglas factors, and given the strength and severity of the first Douglas factors, the seriousness of the offense, the ability to rehabilitate Mr. Carey, and his position as a human resources supervisor, that may not have mitigated it, even in this context. Anything further? No. Thank you. Thank you, Your Honor. Mr. Jackett, do you have anything else you'd like to add? The one thing I would like to point out in rebuttal is that progressive discipline was not followed. They went immediately to termination, and their own regulations say that the purpose of the discipline is to bring a person, correct them. But they gave no consideration, at least there was nothing in the record to show they even considered progressive discipline. To somebody with a career like he had, and a record that he had, with nothing ever done wrong. I mean, this was a Navy guy who saluted the flag, and he never even would have thought of doing anything wrong. And, yes, he went off the deep end on this, because he thought he was being accused of cheating the United States. But progressive discipline would require a different result. I know what he said, and I appreciate what you repeated, that I will never work for this agency or just this supervisor. It was the supervisor. Supervisor. I could understand, given his reaction, they could have assigned him elsewhere. But the progressive discipline is my last straw to argue here. I understand. Okay, thank you, Mr. Jackman. I thank both counsel for their arguments, and this case is taken under submission by the court.